J-S04010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.J.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.D., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1454 MDA 2017 |

Appeal from the Decree Entered August 23, 2017
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  0159-2017

BEFORE:  SHOGAN, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 23, 2018**

L.D., Jr. ("Father"), appeals from the decree entered August 23, 2017, in the Court of Common Pleas of Lancaster County, which involuntarily terminated his parental rights to his minor son, J.J.H. ("Child"), born in June of 2010.[1]  After careful review, we affirm.

The trial court summarized the procedural history of this case as follows:

> [Child] was initially placed, temporarily, on December 18, 2014; the Agency had received a report regarding Mother's mental health, unstable housing, and lack of parenting skills.  . . . Father's whereabouts were unknown at the time; Mother indicated that Father was currently incarcerated and that there had been incidents of domestic violence by him against her.

---

[1] The trial court entered a separate decree that same day involuntarily terminating the parental rights of Child's mother, L.H. ("Mother").  Mother did not appeal the termination of her parental rights, nor did she file a brief in connection with this appeal.

Through hearings on January 12, 2015 and March 9, 2015, the Court adjudicated [Child] to be dependent.[2] The [c]ourt noted that Mother's mental health was unstable and that she ha[d] not had stable housing for a period of time, and that Father had domestic violence issues which resulted in incarceration.

The Child Permanency Plan (CPP) approved on January 6, 2015 required Father to complete goals regarding his drug and alcohol issues, to learn parenting skills, to be financially stable, to maintain a safe home, and to remain committed to [Child]. The CPP provided a primary goal of returning to home.

In its May 14, 2015 Permanency Review Order, affirming the Master's Recommendations, a domestic violence goal was added for Father. That Order noted that Father had made moderate compliance and moderate progress at that time; he had completed a drug and alcohol evaluation, but still had goals outstanding. Father continued to visit. At this time, [Child] had been in the Agency's custody for five months.

[At Permanency Review hearings held November 4, 2015, February 8, 2016, and March 14, 2016, the trial court found Father's compliance and progress on the CPP to be moderate.]

In its[] August 25, 2016 Petition for a Permanency Hearing, the Agency noted that Father had completed parenting classes and had been referred to the Parenting Education Program (PEP) in May of 2016. . . . Father's visits had been increased to two-hours per week in May of 2016, and then again to four-hours per week in July, to coincide with the PEP program visits. These visits were also happening in Father's home, as part of [Child's] transition home. Visits were going well, with the exception of Father's reliance on electronic devices for interaction with [Child], and on Father's ability to set limits for [Child]. At this time, the Agency noted some frustration by Father, from late 2015, with finding a mental health care provider that he could afford, to complete the therapy suggested through the drug and alcohol and resulting mental health evaluations. The Agency provided Father with information for applying for medical assistance and a list of

---

[2] Child has resided in the care of the kinship foster parents with his older half-sibling, A., throughout his dependency.

providers who worked on a sliding-scale basis, and Father had begun attending therapy shortly thereafter. The Agency also noted its oversight in failing to add the domestic violence goal onto Father's CPP in 2015; the Agency had decided, however, in May of 2016, not to pursue any further treatment goals. Father presented documentation of completing two programs, an anger management class in August of 2012 and a domestic violence class in August of 2014, with no further criminal charges relating to those issues. The Agency noted the parenting capacity evaluator's observation that Father's anger issues related to Mother, and that there were concerns about Father's interaction with Agency caseworkers and [Child's] resource parents. The [c]ourt found Father's compliance to be substantial; at this time, [Child] had been in the Agency's custody for twenty months.

By the September 12, 2016 Permanency Review Hearing, [Child] had been in the Agency's custody for twenty-one months. In that review hearing, the [c]ourt found Father's progress on the CPP to be moderate. The [c]ourt noted that Father was inappropriate in his behavior with the resource parents and others, as late as August of 2016. The kinship parents themselves noted, in a resource report, that Father sent them "multiple angry and degrading text messages" that continued even after caseworkers and detectives instructed him to stop. The [c]ourt restated its Order that Father be evaluated for domestic violence and anger management issues, and that the Agency inform any treatment providers of these issues upon referral. The [c]ourt continued to note that no Petition to Terminate Parental Rights was filed because Father's moderate progress served as a compelling reason.

By the October 31, 2016 Status Review Hearing, [Child] had been in the Agency's custody for twenty-two months. By agreement of the parties, and because of Father's inappropriate text messages to the Agency since the September hearing, and out of concern for Agency employee safety, Father's visits with [Child] were moved from Father's house to the Agency. As a caseworker explained, "we don't put parent educators in the home with parents that may have violent tendencies or have anger management issues that are not appropriately addressed at that time."

In a summative February 15, 2017 Petition for a Permanency Hearing, the Agency noted Father's lack of

cooperation since October of 2016. Particularly, Father had been asked to submit to a drug screen on October 16, 2016, but did not attend because the stress made him vomit. An Alternatives to Violence evaluation suggested alcohol abuse and an evaluation for that; the Agency offered to cover the associated costs because Father had no insurance, but Father elected to self-pay with another provider. Father assumed that any medical assistance application by him would be denied. As of February 15, 2017, Father had not obtained that alcohol abuse evaluation. Father had also failed to provide pay stubs for periods of time and reported financial difficulties, including his private counsel fees, criminal fines, $670 per month truck payments, rent and child support. Father later maintained that he spent $1,000 on a Christmas present for [Child]. Father continued to rely on electronic devices for interaction during visits with [Child]; a caseworker noted that 80 to 90% of Father's visit time with [Child] included electronic devices.

Father's progress with the PEP was halted when, in November, his in–home visits with [Child] were relocated to the Agency because of concerns for Agency staff safety. . . . Father was told that the visits could return to his home, and the PEP work resume, when Father was further along in his domestic violence treatment. However, Father contacted the PEP trainer on December 14, 2016 and indicated that he was terminating his parental rights to [Child]; the PEP trainer indicated, as a result, that they would terminate services unsuccessfully. Father admitted there is a "logical connection between [his] e-mail and the termination of the [PEP] program.["] As a result of his domestic violence evaluation, Father had begun both individual and group therapy to address his anger management skills. During intake, however, Father made threats regarding Mother, and during a December 20, 2016 session, Father was unable to control his anger, yelling and deflecting blame onto everyone else in the case. In subsequent e–mails to the Agency, Father called the Agency "pond scum," "filth," "a bunch of BASTARDS, "SICK BASTARDS," "crooked and corrupt," and indicated he would not be attending any hearings in March or thereafter." In other messages, Father indicated he would be "releasing his rights" and "please terminate my rights to [Child]."

For these reasons, the Agency filed an initial Petition to Terminate Parental Rights on January 23, 2017; at that time, [Child] had been in care for 26 months. A full hearing on the

Petition to Terminate Parental Rights was held over a number of days, including . . . June 12, [2017], August 2, 2017[,] and August 21, 2017.[3] . . . When testimony was concluded in August of 2017, [Child] had been in care for 33 months. The [c]ourt issued an Order terminating Father's parental rights to [Child].[4] The [c]ourt found clear and convincing evidence of Father's relinquishment of his parental claim or a failure to perform parental duties for more than six months before the Agency filed its Termination Petition, that Father's continued incapacity, refusal or neglect caused [Child] to be without essential parental care, that Father could not remedy the causes within a reasonable period of time, and that termination of Father's rights would best serve [Child].

Trial Court Order, 10/19/17, at 1-10 (internal citations omitted).

Father filed a petition for reconsideration and special relief on September 13, 2017, which the court denied the next day. Father timely filed a notice of appeal on September 19, 2017, along with a concise statement of errors complained of on appeal.

Father now raises the following issue for our review: "Whether the trial court erred and abused its discretion by involuntarily terminating [Father's] parental rights when there was substantial compliance with the child['s] permanency plan prior to the filing of the petition to terminate parental rights?" Father's Brief at 10 (unnecessary capitalization omitted). Father argues that he was on the verge of reunification with Child in September 2016, but that the trial court did not return Child to his care because of his e-mails.

_____

[3] Child had the benefit of both legal counsel and a guardian *ad litem* during the hearing.

[4] The decree was entered August 23, 2017.

*Id.* at 19. Father maintains that he sent the e-mails "out of frustration and duress," and that he ultimately apologized for his actions. *Id.* Father acknowledges that he also sent an e-mail to Child's caseworker, indicating that he wished to relinquish his parental rights, but insists that this too was the result of frustration. *Id.* at 19-20. Father argues that his actions subsequent to sending the e-mail were inconsistent with a desire to relinquish his parental rights. *Id.* at 20. Father further maintains that he dropped out of his anger management therapy due to financial strain, and that he re-enrolled after receiving his income tax refund.[5] *Id.* at 21.

We consider Father's issue mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted).

---

[5] Father focuses his argument on Section 2511(a)(1), even though the trial court terminated his parental rights under both Section 2511(a)(1) and (2).

- 6 -

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under subsections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity,

- 7 -

abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (internal citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (internal citations omitted).

Instantly, the trial court found that Father has not completed the objectives contained in Child's permanency plan, despite nearly three years of opportunities. Trial Court Opinion, 10/19/17, at 13. The court emphasized that Father failed to complete parenting and anger management programs, and that he delayed in completing drug and alcohol treatment. *Id.* at 13-14. The court also emphasized that Father sent a series of derogatory and hostile e-mails to the Agency and announced his intention to relinquish his parental rights to Child. *Id.* at 13, 15-16.

As discussed above, the record reveals that Father made significant progress toward complying with Child's permanency plan for approximately the first year of Child's dependency. However, Father became uncooperative and hostile toward the Agency during the second half of 2016. During the termination hearing, Child's caseworker, Caitlin Hoover, testified that Father began sending her a series of e-mails containing "concerning" comments. N.T., 8/2/17, at 141-145. She read one such e-mail into the record, as follows:

> [Father] e-mailed me on December 14th of 2016, stating, please terminate my rights to [Child], that way it is over, and I can live my life in misery and move on and don't have to contact -- have to have contact with your devil and pure evil Agency. It's over and done. I'm done fighting the evil that is your Agency.

*Id.* at 144.

It appears that Father then gave up on reunification with Child for the next several months. Ms. Hoover testified that Father sent a similar message announcing his intention to relinquish his parental rights to the parent

- 9 -

educator of his parenting program, PEP. N.T., 8/2/17, at 146-147. PEP discharged Father as unsuccessful on December 19, 2016. *Id.* Father failed to attend the drug and alcohol evaluation recommended by his October 2016 domestic violence evaluation. N.T., 6/12/17, at 25. Father also stopped attending his anger management therapy in early 2017. *Id.* at 28.

Father did not resume attempting to comply with Child's permanency plan until March 2017. Ms. Hoover testified that Father finally completed his drug and alcohol evaluation on March 30, 2017, and that the evaluator recommended intensive outpatient dual-diagnosis treatment. N.T., 6/12/17, at 25. Initially, Father indicated that he was not in agreement with participating in the recommended dual diagnosis intensive outpatient program. *Id.* at 26. He, however, eventually began receiving treatment on May 11, 2017, *id.* at 27, and completed treatment in July 2017. Petitioner's Exhibit 5 (discharge letter). Father also resumed attending anger management therapy on March 29, 2017. *Id.* at 27. By the time of the termination hearing, however, Father still had not completed the recommended number of therapy sessions and had not made sufficient progress in therapy to resume PEP instruction. *Id.* at 29-30, 32-33.

Thus, the record supports the trial court's finding that Father is incapable of parenting Child, and that Father cannot, or will not, remedy his parental incapacity pursuant to Section 2511(a)(2). While Father made progress toward achieving reunification with Child during the first year of the dependency, he did not maintain that progress. Father became increasingly

hostile and uncooperative with the Agency. Father then announced his intention to relinquish his parental rights to Child and seemingly gave up for the next several months. Father's behavior has caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being. ***In re Adoption of M.E.P.***, 825 A.2d at 1272. Moreover, this behavior confirms that he will not be able to provide the care that Child needs within a reasonable period of time. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the trial court erred or abused its discretion by terminating Father's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have

with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (internal quotation marks and citations omitted).

Father argues that he and Child have a bond. Father's Brief at 21. Father contends that Child knew he was on the verge of returning to Father's care in 2016, and that he was likely disappointed by the subsequent reduction in Father's visits. ***Id.*** at 21-22.

The trial court found that Child has no existing, beneficial bond with Father. Trial Court Opinion, 10/19/17, at 18. The court emphasized that Child has a strong emotional bond with his kinship foster parents. ***Id.*** at 18. In addition, the court recognized that Child is extremely close to his older half-sibling, A., who resides in the same kinship foster home. ***Id.*** at 18-19.

During the termination hearing, the trial court heard the testimony of Child's court-appointed special advocate ("CASA"), Carol Bender. Ms. Bender testified that Child appears to be doing very well in the home of his kinship foster parents. N.T., 8/2/17, at 256. Child seems to be happy, and to feel a sense of security and stability. ***Id.*** Ms. Bender testified that Child is "connected" to his kinship foster parents and their family, including their biological children. ***Id.*** Child is also very close to A. ***Id.*** at 257. Ms. Bender expressed concern that Child and A. have resided together their whole lives,

and that separating them would be "very emotional[ly] and psychologically detrimental" to Child. *Id.* at 258.

Concerning Child's relationship with Father, Ms. Bender testified that Child usually refers to Father by his first name and that she has only heard Child refer to Father as "Dad" once. N.T., 8/21/17, at 283, 307. Ms. Bender testified that Child is "eager to go" once his visits with Father are over. *Id.* at 282. She recalled one visit during which Child

> was anxious to get over to see his mother and siblings, and ran out the door and ran into the room where his mother and siblings were. He dropped his birthday gifts at the door. His father said, don't you want these? And he said, no, and kept on[]going.

*Id.* at 282-283. Importantly, the trial court also heard from Child's legal counsel, Elizabeth A. Stineman, Esquire, who stated as follows:

> I have had the opportunity to speak to both Child and [A.] First, I'll indicate that they did not wish to come to court and to testify. They asked that I speak on their behalf. They have indicated to me -- and I spoke to them separately -- that they would like me to tell the Court that they would like to go with their mother, if possible. They recognize that that may not be possible, but alternatively, they would like to remain where they are with the resource parents.

*Id.* at 322.

Thus, the record supports the trial court's finding that terminating Father's parental rights would best serve Child's needs and welfare pursuant to Section 2511(b). While Child certainly has a relationship with Father, it is not a positive or beneficial parent/child bond. The record reveals that Child has a more significant bond with his kinship foster parents and with A. Child's

relationship with Father should not prevent him from enjoying the benefits of a permanent and stable home.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights to Child involuntarily. Therefore, we affirm the court's August 23, 2017 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/23/2018